### Case No. 8,125.

#### The LAVINIA v. BARCLAY.

#### [1 Wash. C. C. 49.] [1]

Circuit Court, D. Pennsylvania.  April Term,
1803.

SHIPPING — BOTTOMRY BOND — NECESSITY FOR
FUNDS — RESIDENCE OF OWNER WHERE BOND
MADE — ADVANCE OF FREIGHT BY CONSIGNEE—
MARINE INTEREST.

1. To make a hypothecation bond, executed by
the master of a vessel, valid; the necessity of rais-
ing the funds advanced upon it, by such means,
must be shown.

2. If one of the owners of the vessel reside at
the port where the bond is given, it is not good.

3. The consignee of a vessel is bound to advance
the freight, for the supply of the necessities of the
voyage, to be so applied by the master.

4. While the freight is in the hands of the con-
signee, he cannot advance money to the master on
marine interest, unless he has been directed by
the consignor to appropriate the freight to another
purpose.

This was an appeal from a sentence of the
district court, in favour of the appellees, the
obligees, in a bottomry bond against the ship
Lavinia; the property of the assignees of
Peter Blight, a bankrupt.

WASHINGTON, Circuit Justice.  The ma-
terial facts in this case appear to be as fol-
lows: The Lavinia, commanded by Captain
Vicaray, sailed from Philadelphia to Lon-
don, about the 10th day of January, 1800,
with a cargo consigned to H. H. Fentham,
the correspondent of Peter Blight.  Both
ship and cargo belonged to Blight, although
to protect them against his creditors in
England, he made a feigned sale of the ship
to Mr. Reid, one of his clerks, some time pre-

¹ [Originally published from the MSS. of Hon.
Bushrod Washington, Associate Justice of the
Supreme Court of the United States, under the
supervision of Richard Peters, Jr., Esq.]

vious to her sailing; and the cargo, by the
bill of lading, was to be delivered to the or-
der of Reid, upon his paying freight, as per
charter party.  The whole was a contriv-
ance: there was in reality no charter party;
the sale to Reid was a mere pretence to cov-
er the ship from attachments by Blight's
creditors; and the cargo was the property of
Blight.  The nature of this transaction is
fully disclosed in a confidential letter from
Blight to Fentham, of the 1st of January,
1800.  But to give a colour to this plan of
deception, a letter was written on the same
1st of January, by Blight, to Fentham, in-
forming him of the interest of Reid in the
cargo, and introducing him to Fentham.
This was accompanied by another letter
from Reid to Fentham, giving directions re-
specting the disposition of the cargo.

Captain Vicaray was compelled to put in-
to Plymouth, from whence he went by land
to London; and on the 8th of February, he
delivered to Fentham, (who had previously
been declared a bankrupt,) the letters of the
1st of January from Blight and Reid.  The
contents of these letters were not at that
time made known by Fentham to the appel-
lees, (his assignees) but he informed them
that the cargo should be delivered to them,
which being at first refused, a messenger
was despatched by the commissioners to
take possession of the ship and cargo, which
was done.  Finally, the captain consented
to deliver the cargo to the assignees, upon
certain terms stipulated in an agreement
signed by the captain and the assignees, (the
libellants,) on the 10th of February.  These
terms were; that the libellants should ap-
ply the nett proceeds of the cargo, after pay-
ing freight, commission, expenses of taking
and keeping possession, and delivering the
said cargo, duties, and all other charges and
expenses relating to the said cargo; towards

satisfaction of bills or other engagements accepted, contracted, or made by Fentham, on account of Peter Blight. The latter part of this agreement seems to have been intended to conform to the directions of Mr. Blight, contained in his letters to Mr. Fentham, in which he orders the proceeds of the cargo to be applied to the discharge of Fentham's engagements on his (Blight's) account.

Captain Vicaray having. between the time of entering into this agreement and the 19th of May, incurred debts to the amount of £1420. 2s. 6d. for repairs made to the Lavinia, for the outfits of her return voyage, for repairs made at Plymouth previous to her proceeding to. London, for the wages and support of his mariners and other incidental expenses; applied to the appellees for money to discharge those debts, who consented to advance for this purpose the above sum of money, upon receiving security for the repayment of the same, by way of hypothecatur of the vessel and freight. A bottomry bond was accordingly executed on the 21st of May by Captain Vicaray, differing from the usual form of similar instruments in no other respect than in its recital, which states "that the captain had incurred sundry expenses, and had delivered the cargo to the assignees of H. H. Fentham, without being able to recover any part of the proceeds of the said cargo, or any freight for the same, and that the obligees had advanced him money for defraying those expenses," &c. On the same day an agreement was signed by the solicitor. for the appellees, referring to the bottomry bond, by which he agreed on the part of the appellees, that in case a less sum than that mentioned in. the bottomry bond should be paid to the appellees, in London, at any time within six months from the date thereof, that the same should be accepted in lieu of the said bottomry debt. The Lavinia arrived safe at Philadelphia, the port mentioned in the bottomry bond, and after the day of payment stipulated in the bond had passed; but within the six months mentioned in the agreement, this libel was filed, to have satisfaction of the debt due by the bond.

The first point made in the cause was, that the libel was prematurely filed, as the owner of the ship had six months to discharge the ship from the lien created by the bottomry bond, upon paying a smaller sum. Considering the agreement in the light of a defeasance to the bond, I intimated to the bar an opinion in support of this objection, but as the success of this objection could only operate to delay the libellants. I recommended it to the parties to make some accommodation as to this point, which has been done upon terms, so that the objection is waived. The defence upon the merits, raised by the answer, and which has been much pressed in the argument is, that the appellees ought to have advanced from the proceeds of the cargo, the sum necessary for discharging the debts incurred by the captain on account of the ship; or at any rate, so much as the freight of the cargo would have amounted to, if the ship and cargo had belonged to different persons. On the other side it was contended, that the appellees have performed every article stipulated by them in the agreement of the 10th of February. That they have paid all the duties and expenses attending the delivery of the cargo, and have applied the residue of the nett proceeds of the cargo to the discharge of Fentham's engagements for Blight, and that as the ship and cargo belonged to the same person, no freight was due, and consequently nothing on that account could have been demanded by the captain.

The question is, have the appellees a right to recover the debt secured by the bottomry bond, under all the circumstances of this case? The right of a captain to hypothecate his ship for advances made in a foreign port, to enable him to prosecute his voyage, is essential to .commerce. But to give validity to such a contract as against the ship, the necessity of raising money in this way, and for the purposes of the voyage, should be made clearly to. appear. If therefore one of the owners reside at the port where the expense is incurred, the power of the captain to raise money in this way is not permitted, inasmuch as the necessity does not exist. In like manner the consignee of the cargo at the port of delivery. is bound to advance to the ship owner, (whose agent the captain is,) the freight due on the cargo; which the captain can employ in defraying the expenses necessary for prosecuting his voyage; and therefore the consignee cannot, whilst possessed of this fund, retain the same, and burthen the owner with a new debt at marine interest. This rule as to the consignee may admit of exceptions, and the present case seems to furnish one, independent of the special agreement of the 10th of February. If Fentham had not failed, and the cargo had been received by him, he might fairly have applied the whole proceeds of the cargo to the discharge of his own engagements, entered into on account of Blight, and have justified such an appropriation under the positive and unqualified instructions of Blight, contained in his letters of November and December, directing him so to apply the proceeds of the cargo. I do not say that Fentham was so absolutely bound by these instructions, that he might not have applied a part of those funds to the discharge of the expenses incurred in repairing and refitting the ship, for her return voyage; but I am of opinion that he was under no obligation to do so; and consequently he might have applied the whole proceeds as directed by Blight, and have advanced his own money for the expenses on the security of the ship.

The assignees of Fentham having obtained possession of the cargo under a special agreement with the captain, the question as to them must depend upon the import and fair construction of that agreement. If that agreement left in the hands of the appellees sufficient funds to cover their advances to the captain, they had no right to advance other money upon marine interest. It is not disputed but that the proceeds of the cargo have been disposed of in the manner stipulated in the agreement, except the freight, which it is contended ought to have been applied to the discharge of the expenses for which this bond was given. It is admitted by the appellant's counsel, that no freight is due where the owner of the ship is also owner of the cargo; but it is insisted that the fair meaning of this contract was to pay the same sum, under the name of freight, as the ship would have earned, if in truth different persons had owned ship and cargo. With respect to the facts, important in this part of the case, there is considerable obscurity. It is certain that the appellees had at one time reason to believe that Blight was owner of the ship; because it is proved by Fentham, that they had received all Blight's letters to him dated in November and December, 1799, and had pursuant to instructions contained in one of them, effected an insurance on the ship in the name of Blight. It also appears, that previous to the 10th of February, 1800, the appellees were informed by Fentham, that the cargo, though stated in the bill of lading to belong to Reid, was in fact the property of Blight. These circumstances seem strongly to show, that when the appellees agreed on the 10th of February to except the freight out of the payments on account of Fentham's engagements for Blight, they knew that, strictly and technically speaking, no freight could be due, and that the only way to discharge them from a meditated deception upon the captain, is to construe the contract as contended for by the appellant's counsel; falsity appearing upon the face of the bill of lading in stipulating for freight according to charter party; thus holding out the idea, that whoever the real owner of the cargo might be, he was answerable to some other person as ship owner for the carriage of the cargo.

The mystery in which these transactions are enveloped, will not permit me to say with confidence, that the appellees either did or did not know the real truth of the case. If they were acquainted with it, they were attempting to practise a deception upon the captain, for which they ought not to derive an advantage. But as fraud is not to be presumed, I am not prepared to decide that any was meditated in this case. A disclosure of the confidential letter from Blight, of the 1st of January, would at once have cleared up all the doubts which hung upon this transaction; but the contents of that letter were not communicated to the appellees until after the agreement of the 10th of February, and prior to the advances made by them to the captain. It would seem that this discovery produced an explanation of the agreement of the 10th of February, and that the captain, abandoning his claim to freight, where in reality none was due, consented to raise the money he required, by hypothecating the ship. Whether the captain knew, on the 10th of February, that the ship and cargo both belonged to Blight, is not certain, though it is strongly to be inferred. If he did not, it would seem from the recital in the bottomry bond, that after discovering this to be the fact, he was satisfied that the obligation of the appellees to pay freight was at an end. The recital does not state that the appellees had refused to pay the freight, but that the captain was unable to recover it; implying thereby a want of right to recover it, since it does not appear that any attempt had been made to coerce the payment.

It is contended by the counsel for the appellant, that the costs of the repairs made at Plymouth, and of the seamen's wages and provisions, ought at any rate to be deducted from this bond, because they were the expenses of delivering the cargo, which the appellees were bound to pay. It by no means appears that the cost of the repairs made at Plymouth is to be considered as an expense attending the delivery of the cargo, because it is not pretended even in the answer to the libel that they were necessary to enable the ship to proceed from Plymouth to London; as the captain was directed by Blight to have the ship repaired before her return, it is more probable that those put upon her at that port were done in execution of those instructions, and with a view to the return voyage. As to the seamen's wages and provisions, the way to understand whether they were intended to be included under expenses of delivering the cargo, let it be supposed that the freight had been paid—it would then be clear that seamen's wages and provisions could not have been claimed; because the answer would have been conclusive, that those expenses were chargeable to the freight and to be paid out of it. These expressions were only intended to comprehend wharfage, lighterage, and such petty charges. Sentence affirmed.